7 F.3d 720
 APPLEY BROTHERS; Appley Farms, Inc.; Kevin Beerman; Tom
Curry; Dakota Eastern, Ltd.; Raymond Hall; Hayes & Hayes,
Inc.; Sam Hatton; Robert Hebeler; Dean Hebeler;
Heckathorn Farms, Inc.; Curt Jervik; Dennis Kjose; Gordon
Kleihauer; David Larsen; Morris Larsen; Todd Larsen;
Lyle Lawrensen; Eldean Lykken; Martin McInerney; Lawrence
McInerney; Daniel O'Connor; Kelly O'Connor; Owen Quall;
Mark Quam; Lyle Wagner; Kaylor Grain Co.; Viborg Coop
Elevator; Hurley Elevator; Transamerica Insurance Company;
Burnette Quam, Plaintiffs-Appellants,
v.
UNITED STATES of America, Defendant-Appellee.
 No. 92-3382.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 17, 1993.
Decided Oct. 13, 1993.
Rehearing Denied Dec. 15, 1993.
 
 Jonathan VanPatten, Vermillion, SD, argued, for plaintiffs-appellants.
 Bertha Mitrani, Washington, DC, argued, for defendant-appellee.
 Before JOHN R. GIBSON, Circuit Judge, ROSS, Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 Appley Brothers appeal the district court's dismissal of its action against the United States for losses as a result of the United States Department of Agriculture's negligent inspection of the Bird Grain Company warehouse, a federally licensed grain warehouse. The district court held that it lacked subject matter jurisdiction because the claims were barred by both the discretionary function exception and the misrepresentation exception to the Federal Tort Claim Act. 28 U.S.C. § 2680(a), (h) (1988 & Supp.1993). Appley Brothers contend that the losses were caused by the negligent failure to follow specific agency regulations, and that the discretionary function and misrepresentation exceptions do not apply. We reverse and remand.
 
 
 2
 Appellants include a group of farmers and grain elevators who sold or stored grain at the Bird Grain warehouse, and Transamerica, issuer of warehouseman bonds covering the Bird Grain operation. For simplicity, as all appellants raise the same issues, we refer to all appellants as Appley Brothers.
 
 
 3
 Between March 29 and April 1, 1988, inspectors from the United States Department of Agriculture examined the Bird Grain operations and cited Bird Grain for a number of violations, including corn and soybean inventory shortages. On April 1, 1988, U.S.D.A. inspectors examined Bird Grain and prepared a WA-125 form or a Memorandum of Adjustments. This form showed that Bird Grain had corn and soybean inventory shortages, and had "previous show short positions." Specifically, the WA-125 showed that in May, September, and October 1987, and January 1988, Bird Grain had corn shortages as high as 8591 bushels, and soybean shortages in January and February 1987 of up to 921 bushels. The inspectors directed Bird Grain to eliminate these shortages. The April 1 inspection showed that Bird Grain was again deficient in corn by 6405 bushels and in soybean by 8159 bushels. The inspectors directed Bird Grain to remedy the deficiencies.
 
 
 4
 On August 5, 1988, U.S.D.A. inspectors conducted a special examination of Bird Grain. The stated purpose of the inspection was "to check compliance with WA-125 issued 4-1-88." The inspectors did not indicate on the report whether they checked the corn or soybean inventories, or whether they verified Bird Grain's compliance with the directive to eliminate previous show short positions. The outcome of the August 5 examination was that Bird Grain was cited for continuing problems with temporary storage bunkers but was otherwise allowed to continue in operation. After August 5, various farmers and grain elevators continued to deliver grain to Bird Grain for storage or purchase by it. Transamerica also issued a $233,000 warehouseman's bond effective for one year beginning September 23, 1988.
 
 
 5
 On November 15, 1988, U.S.D.A. inspectors conducted an inspection of Bird Grain. The inspectors discovered grain shortages, and the U.S.D.A. suspended Bird Grain's federal license on November 22, 1988. Bird Grain's inventory was liquidated and proceeds distributed to the holders of valid storage claims on pro rata basis.
 
 
 6
 After this inspection, the U.S.D.A. prepared daily position reports which showed that on August 5, 1988, (the time of the second inspection), Bird Grain was short approximately 358,011 bushels of corn. At that time, it had permanent storage capacity of 631,000 bushels and an additional temporary storage capacity of 140,000 to 150,000 bushels. The shortage thus represented approximately forty-six percent of the licensed capacity and possibly over fifty percent of the existing obligations. This shortage was higher than that discovered during the November 15 inspection which resulted in the suspension of Bird Grain's license.
 
 
 7
 Appley Brothers sued the U.S.D.A. alleging a breach of U.S.D.A.'s regulatory duty and a breach of its common law duty, and seeking to recover the value of grain delivered for which they had not been paid. Transamerica joined the action, alleging damages because of its issue of the $233,000 warehouseman's bond on September 23, 1988. They alleged that had the inspectors conducted even a cursory visual inspection of grain inventories, they would have immediately discovered the grain shortages, and Bird Grain's violation of the United States Warehouse Act, 7 U.S.C. § 246 (1988). The government filed a motion to dismiss for lack of subject matter jurisdiction, arguing that the claims were barred by the misrepresentation exception and the discretionary function exception to the Federal Tort Claims Act. 28 U.S.C. § 2680(a), (h). The district court granted the government's motion, and Appley Brothers appeals.
 
 I.
 
 8
 The Federal Tort Claims Act authorizes suits for damages against the United States for "injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b) (1988). The government is not liable for "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a) (1988).
 
 
 9
 We review de novo the dismissal of a case under the discretionary function exception. Tracor/MBA, Inc. v. United States, 933 F.2d 663, 665 (8th Cir.1991). When analyzing whether the discretionary function applies, we first consider whether the conduct complained of is a matter of choice for the governmental employee. Berkovitz v. United States, 486 U.S. 531, 536, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988). The discretionary function exception "covers only acts that are discretionary in nature, acts that 'involv[e] an element of judgment or choice.' " United States v. Gaubert, 499 U.S. 315, 322, 111 S.Ct. 1267, 1273, 113 L.Ed.2d 335 (1991) (quoting Berkovitz, 486 U.S. at 536, 108 S.Ct. at 1958). The requirement of judgment or choice is not satisfied if a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," because "the employee has no rightful option but to adhere to the directive." Berkovitz, 486 U.S. at 536, 108 S.Ct. at 1958.
 
 
 10
 Even if the challenged conduct involves an element of judgment, we then consider whether the judgment is of the kind that the discretionary function exception was designed to shield. Gaubert, 499 U.S. at 322, 111 S.Ct. at 1273. The exception was designed to " 'prevent judicial "second guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.' " Id. (quoting United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 814, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660 (1984)).
 
 
 11
 The district court concluded that 7 U.S.C. § 246 of the Warehouse Act gave the Secretary of Agriculture broad discretion to decide whether to revoke Bird Grain's warehouse license, and thus, Appley Brothers' claims were barred by the discretionary function exception. Appley Brothers v. United States, No. 92-4037, slip op. at 7-8 (D.S.D. Sept. 16, 1992). The court reasoned that even if the inspectors had issued a new form TW-125 as required by their agency handbook, the U.S.D.A. could still have allowed Bird Grain to remain open just as it did after the April 1 inspection. Id. at 8.
 
 
 12
 Appley Brothers contend that the inspectors' failure to check compliance with the April 1 citation violated a mandatory agency procedure and, thus, the conduct is not protected by the discretionary function exception. Appley Brothers point out that the stated purpose of the August 5 special examination was "to check compliance with WA-125 issued 4-1-88." They also cite the U.S.D.A. published Grain Warehouse Examiner's Handbook, which states:
 
 
 13
 In all instances where a previously issued Form TW-125 has not been completely cleared, the examiner is to issue a new Form TW-125 listing those conditions which remain uncorrected at the time of the special examination. If another special examination is necessary, the same procedure should be followed.
 
 
 14
 (Emphasis added).
 
 
 15
 The handbook also instructs that if the inspector discovers quantity deficiencies between one and three percent, the inspector "will complete Form TW-315." (Emphasis added). The handbook further instructs that: "If a deficiency exceeds the greater of three percent of the storage obligation or 2,000 bushels, the examiner will complete Form TW-315 and report by telephone to the area office." (Emphasis added).
 
 
 16
 Appley Brothers argue that the notations on the April 1 WA-125 included previous "show short" positions, and soybean and corn deficiencies on that date. Appley Brothers contend that the inspectors' failure to follow their own policy directive in checking to see if Bird Grain remedied the prior deficiencies allowed Bird Grain to continue in operation through the 1988 crop harvest. They assert that the inspectors violated agency mandated procedure and, therefore, their actions are not protected under the discretionary function exception. They point out that a one to three percent quantity deficiency required the inspector to complete Form TW-315, and that a deficiency of forty-six percent required immediate suspension of Bird Grain's license.
 
 
 17
 Appley Brothers contend that the facts here follow those in several cases in which the Supreme Court and this court have concluded that the discretionary function does not apply. In Berkovitz, for example, the Supreme Court concluded that the discretionary function exception did not apply to certain decisions made by the National Institute of Health's Division of Biologic Standards. 486 U.S. at 539, 108 S.Ct. at 1960. One of Berkovitz's claims was that the Bureau employees knowingly approved release of a noncomplying vaccine lot in violation of the Bureau's own policy of testing all lots for compliance with safety standards and preventing distribution of any noncomplying lots. Id. at 547, 108 S.Ct. at 1964. The Court held that this claim was not directed at governmental action that involved policy discretion and, therefore, the exception did not apply. Id. The Court explained that although the discretionary function exception barred any challenge to the Bureau's formulation of policy as to how to regulate the release of vaccine lots, once the Bureau decided to test all lots and prevent distribution of noncomplying lots, the Bureau's decision to release a noncomplying lot did not involve the exercise of policy discretion. Id. at 546-48, 108 S.Ct. at 1964-65.
 
 
 18
 Appley Brothers also argues that this case is analogous to this court's decisions in Hurst v. United States, 882 F.2d 306 (8th Cir.1989), McMichael v. United States, 856 F.2d 1026 (8th Cir.1988), and Aslakson v. United States, 790 F.2d 688 (8th Cir.1986). In Hurst, a regulation imposed a duty upon the Army Corps of Engineers to issue a prohibitory order if the district engineer discovered a permit violation during the construction of a project. 882 F.2d at 309. The basis of plaintiffs' action was the failure to comply with mandatory regulations, and we remanded for trial on the merits. Id. at 310. Similarly, in McMichael, we concluded that the discretionary function exception did not apply to the government inspector's failure to order an evacuation of a munitions plant during an electrical storm. 856 F.2d at 1033-34. We reasoned that the inspector's checklist required the inspector to shut down the plant in an electrical storm and, thus, because no discretion was involved, the exception did not apply. Id. at 1033. In Aslakson, we held that the decision of a United States agency not to elevate certain power lines was not protected by the discretionary function exception because the agency's own policy required it to "raise its power lines if it constitute[d] a safety hazard." 790 F.2d at 693.
 
 
 19
 The government responds that the U.S.D.A.'s conduct was well within the parameters of the discretionary function exception. The government points to provisions of the Warehouse Act and its accompanying regulations which allow the U.S.D.A. broad discretion in deciding whether to ultimately suspend or revoke a warehouse license. 7 U.S.C. § 246 provides:
 
 
 20
 The Secretary of Agriculture, or his designated representative, may, after opportunity for hearing has been afforded to the licensee concerned, suspend or revoke any license to any warehouseman conducting a warehouse under this chapter, for any violation of or failure to comply with any provision of this chapter or of the rules and regulations made hereunder.... Pending investigation, the Secretary of Agriculture, or his designated representative, whenever he deems necessary, may suspend a license temporarily without hearing.
 
 
 21
 The government points out that the statute, accompanying regulations,[1] and the Grain Warehouse Examiner's Handbook do not require that a license be revoked upon the discovery of shortages and, thus, the decision to revoke a license is purely one of choice protected by the discretionary function exception.
 
 
 22
 The government contends that this case is more like the Supreme Court's ruling in Varig Airlines, 467 U.S. at 797, 104 S.Ct. at 2755, and our recent ruling in Tracor/MBA, 933 F.2d at 663. In Varig Airlines, the Court concluded that the FAA's decision to institute a "spot-check" system to determine the compliance with design and safety standards, as well as the monitoring of the FAA employees' execution of the spot-checks were discretionary. 467 U.S. at 819, 104 S.Ct. at 2767. The government contends that there is no meaningful distinction between the U.S.D.A.'s certification process pursuant to the Warehouse Act and the FAA's decision in Varig Airlines. In Tracor/MBA, we concluded that the discretionary function exception did not apply because the safety checklist, unlike that in McMichael, did not "specifically prescribe a course of action for the inspector to follow in checking compliance, or in deciding what to do if an inspection discovered a problem." 933 F.2d at 667-68.
 
 
 23
 The government asserts that Cooper v. American Auto Insurance Company, 978 F.2d 602 (10th Cir.1992), supports its argument that the discretionary function exception immunizes it from liability. In that case, a livestock dealer sued the Packers and Stockyards Administration, alleging that the agency failed to act on its knowledge that a cattle buyer was in violation of agency rules and regulations. Id. at 612. The Fourth Circuit held that the discretionary function exception barred the claim because the Packers and Stockyards Act granted very broad discretion to the Administration regarding enforcement of their rules and regulations, and did not specify procedures for the agency to follow when it suspected violations. Id.
 
 
 24
 The government also analogizes this case to several cases brought against the Federal Deposit Insurance Corporation based on the negligent inspection of savings and loans. Many of those cases conclude that the discretionary function exception does not apply to the alleged negligence of bank examiners. For example, in Gaubert, the Court dismissed a claim against the Federal Home Loan Bank Board, concluding that the regulators' selection of new officers and directors, as well as management of a failed savings and loan was discretionary. 499 U.S. at 327-28, 111 S.Ct. at 1276-77. The Court reasoned that although there were extensive regulations governing the regulators' conduct, none of the regulations mandated a particular form of action. Id., 499 U.S. at 330-31, 111 S.Ct. at 1277-78. The government also cites cases in which courts have held that various decisions of the FDIC are protected by the discretionary function exception. See, e.g., Federal Deposit Ins. Corp. v. Mmahat, 907 F.2d 546, 552 (5th Cir.1990), (decision not to place savings and loan into receivership), cert. denied, 499 U.S. 936, 111 S.Ct. 1387, 113 L.Ed.2d 444 (1991); Golden Pacific Bancorp v. Clarke, 837 F.2d 509 (D.C.Cir.) (decision as to whether bank was solvent), cert. denied, 488 U.S. 890, 109 S.Ct. 223, 102 L.Ed.2d 213 (1988); Federal Deposit Ins. Corp. v. Irwin, 916 F.2d 1051, 1055 (5th Cir.1990) (same). The government contends that the inspectors had discretion to revoke or suspend a license, just like the bank examiners have in deciding whether to close a savings and loan, and the courts have no jurisdiction to "second guess" the U.S.D.A.'s decision to continue the license following the August 5 inspection. Finally, the government points out that, in general, courts have afforded licensing processes protection under the discretionary function exception.
 
 
 25
 This case presents a very close question. We cannot say that this case is just like Berkovitz and the other cases Appley Brothers cite from this circuit. Berkovitz mandated specific action when a noncomplying lot violation was discovered. 486 U.S. at 545-48, 108 S.Ct. at 1963-65 (Bureau adopted policy of testing all vaccine lots and preventing distribution of noncomplying lots). So, too, did cases like McMichael, 856 F.2d at 1033 (checklist required that plant be closed in event of electrical storm). Here, there is no question that the ultimate decision to close the warehouse was discretionary.[2] Nevertheless, agency policy required that a new form be issued in the event that the warehouse had not cleared or corrected earlier reported shortages. Here, the August 5 inspection report did not comment on the shortages reported in the April 1 WA-125 form, even though the stated purpose of the inspection was "to check compliance with the WA-125 issued 4-1-88." In conducting the August 5 inspection, the inspectors violated not only the mandatory requirements of the grain inspector's handbook, but also the stated purpose of their inspection. The inspectors had no discretion on August 5 as to whether they should check to see if Bird Grain had cured the deficiencies found on April 1 and to issue a new TW-125 reporting that information. Cf. Autery v. United States, 992 F.2d 1523, 1529 (11th Cir.1993) (general guideline insufficient to deprive the federal government of the protection of the discretionary function exception); Layton v. United States, 984 F.2d 1496, 1500-05 (8th Cir.1993) (discretionary function exception applies to negligence claims against Forest Service), cert. denied, --- U.S. ----, 114 S.Ct. 213, 126 L.Ed.2d 170 (1993).
 
 
 26
 The fact that there is no written policy mandating that the U.S.D.A. revoke Bird Grain's license if inspectors discover substantial shortages is not fatal to Appley Brothers' argument that the discretionary function does not apply. Although the revocation order itself is discretionary, the inspectors' failure to see if Bird Grain cleared the violations noted in the April 1 report prevented the Secretary from exercising discretion to decide whether to revoke Bird Grain's license.
 
 
 27
 The government's statement that the Secretary decided "to continue" the license following the August 5 inspection is not an accurate description of the Secretary's decision. The argument that the inspection would not necessarily have resulted in suspension of Bird Grain's license is met with the stark fact that when the inspectors discovered and reported deficiencies in November that were substantially smaller than those that existed on August 5, the Secretary revoked Bird Grain's license. The discretionary language contained in the Warehouse Act and accompanying regulations does not immunize the inspectors' actions. The government's argument that even if the inspectors had followed the mandatory guidelines or followed the stated mission of the August 5 inspection, the Secretary's decision not to revoke Bird Grain's license was discretionary is simply inconsistent with the evidence that the discovery of substantially greater deficiencies in November resulted in the revocation of Bird Grain's license. Moreover, because the inspectors failed to follow the mandates of their own regulation, the Secretary was unable to exercise discretion or make an informed exercise of discretion. The causative fact in Appley Brothers' claims is the inspectors' failure to follow the mandatory requirements of the handbook, not the Secretary's failure to revoke Bird Grain's license.[3] The Appley Brothers claims are based on the inspectors' violation of mandated agency policy, and therefore, the discretionary function exception does not apply.
 
 
 28
 There is no doubt that if the inspectors had complied with the agency policy and reported the shortages, the Secretary's decision not to revoke Bird Grain's license would be a discretionary decision protected by the discretionary function exception. See, e.g., Varig Airlines, 467 U.S. at 819-21, 104 S.Ct. at 2767-68 (FAA's decisions to "spot-check" aircraft design and manufacture for compliance with safety regulators, and performance of the "spot checks" protected by discretionary function exception); Berkovitz, 486 U.S. at 540-45, 108 S.Ct. at 1961-64 (Bureau's formulation of policy regarding the appropriate way to regulate release of vaccine lots and officials' exercise of discretion allowed by the policy protected by the discretionary function exception). This is not, however, the circumstance before us. Appley Brothers do not challenge the licensing process. Here, the inspectors failed to obtain the mandated information and, as a result, the Secretary made no decision as to whether to revoke Bird Grain's license, or made a decision based on erroneous information.
 
 
 29
 The government next argues that the U.S.D.A.'s decision to continue Bird Grain's license involved choice grounded in policy underlying the Warehouse Act, and thus, the discretionary function applies. Berkovitz, 486 U.S. at 536, 108 S.Ct. at 1958. "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." Gaubert, 499 U.S. at ----, 111 S.Ct. at 1274. See Lather v. Beadle County, 879 F.2d 365, 368 (8th Cir.1989) (discretionary function exception protects only governmental decisions that involve balancing of policy considerations).
 
 
 30
 Appley Brothers acknowledge that the U.S.D.A.'s decision to suspend a license, see 7 U.S.C. § 246, is grounded in "social, economic, and political policy." See Gaubert, 499 U.S. at 324, 111 S.Ct. at 1273. Nevertheless, they argue that the decision to suspend is irrelevant because their claim is based on the inspectors' failure to verify whether Bird Grain cured its past violations and discover obvious violations of the Warehouse Act. Agency policy required the inspectors to see if Bird Grain remedied its violations, and the decision is not one grounded in social, economic, and political policy. Indeed, the failure was not one of policy choice; rather, it was "a failure to effectuate policy choices already made." Camozzi v. Roland/Miller & Hope Consulting Group, 866 F.2d 287, 290 (9th Cir.1989). See Dube v. Pittsburgh Corning, 870 F.2d 790, 799 (1st Cir.1989) (Navy's negligent failure to warn of asbestos hazards not a policy decision protected by the discretionary function exception); Prescott v. United States, 959 F.2d 793, 799 (9th Cir.1992) (summary judgment inappropriate when government failed to adduce any evidence that the specific acts of negligence flowed directly from the policy choices of on-site officials); Collins v. United States, 783 F.2d 1225, 1229 (5th Cir.1986) (decision to annul imminent danger order not related to social, economic, or political policy).
 
 II.
 
 31
 Appley Brothers next argue that the district court erred in ruling that their claims were also barred by the misrepresentation exception. 28 U.S.C. § 2680(h).[4] The district court characterized the injuries suffered by the appellants as being caused either by U.S.D.A.'s failure to communicate information regarding the conditions at Bird Grain or the U.S.D.A.'s implied representation that Bird Grain was a sound facility. Appley Brothers v. United States, No. 92-4037, slip op. at 10 (D.S.D. Sept. 16, 1992). The court characterized the claim as based on communication or misinformation and, thus, barred by the misrepresentation exception. Id.
 
 
 32
 Two Supreme Court cases discussed the circumstances calling for the application of the misrepresentation exception. In United States v. Neustadt, 366 U.S. 696, 698-99, 81 S.Ct. 1294, 1296-97, 6 L.Ed.2d 614 (1961), plaintiffs bought a home which had been inspected by an appraiser for the Federal Housing Administration. The inspector found no defects which would have disqualified the property for mortgage insurance. Id. at 698, 81 S.Ct. at 1296. After the plaintiffs moved in the house, they found numerous defects, and sued the FHA. Id. at 700, 81 S.Ct. at 1697. The Court concluded that the claim was barred by the misrepresentation exception, reasoning that action for breach of "the duty to use due care in obtaining and communicating information upon which [a] party may reasonably be expected to rely in the conduct of his economic affairs" was within the commonly understood legal definition of misrepresentation. Id. at 706, 81 S.Ct. at 1300.
 
 
 33
 The Supreme Court clarified the distinction between an action based on misrepresentation and an action based on an independent tort in Block v. Neal, 460 U.S. 289, 103 S.Ct. 1089, 75 L.Ed.2d 67 (1983). In that case, plaintiff applied for a Rural Housing Loan from the Farmers Home Administration. Id. at 291, 103 S.Ct. at 1090. After the loan was approved, plaintiff contracted with a builder to construct a house. Id. The contract required the builder's work to conform to plans approved by the FmHA, and granted FmHA the right to inspect and to reject any non-complying work or materials. Id. An FmHA official inspected the house and found no defects. Id. at 292, 103 S.Ct. at 1091. After the plaintiff moved in and found numerous defects, she sued the agency. Id. The Court rejected the argument that the case was controlled by Neustadt:
 
 
 34
 [T]he essence of an action for misrepresentation ... is the communication of misinformation on which the recipient relies. The gravamen of the action against the Government in Neustadt was that the plaintiff was misled by a "Statement of FHA Appraisal" prepared by the Government. Neustadt alleged no injury that he would have suffered independently of his reliance on the erroneous appraisal.
 
 
 35
 460 U.S. at 296, 103 S.Ct. at 1093.
 
 
 36
 The Court contrasted Neustadt to the facts before it, and reasoned that plaintiff had stated a viable cause of action under Restatement (Second) of Torts § 323 (1965)--the Good Samaritan doctrine. Id. at 297, 103 S.Ct. at 1094. The Court distinguished the FmHA's duty to use due care to ensure that the builder followed previously approved plans and cure all defects before completing construction from the FmHA's duty to use due care in communicating information to the plaintiff. Id. at 297-98, 103 S.Ct. at 1094-95. The Court emphasized that even though there may not be a cause of action for negligent misrepresentation, a claim could still lie for damages caused by other aspects of the government's conduct. Id. at 298, 103 S.Ct. at 1094.
 
 
 37
 Appley Brothers argue that the district court erred in concluding that this case was like Neustadt, and that the U.S.D.A.'s negligence was in failing to discover violations of the Warehouse Act, not in communicating information. The cause of action for breach of a regulatory duty does not depend on the transmission of erroneous information as an essential element. See National Carriers, Inc. v. United States, 755 F.2d 675, 677 (8th Cir.1985). We are persuaded that Appley Brothers base their claims on the U.S.D.A.'s negligent inspection of the warehouse, and not on the U.S.D.A.'s negligent dissemination of information. Appellants' claims are like those made in Block v. Neal, 460 U.S. at 294-96, 103 S.Ct. at 1092-94. The U.S.D.A.'s failure to discover violations of the Warehouse Act is independent of the inspectors communication of information. See id. at 297-98, 103 S.Ct. at 1094-95.
 
 
 38
 The difference between this case and Neustadt is also demonstrated in our decision in Bonuchi v. United States, 827 F.2d 377 (8th Cir.1987). In that case, we concluded that home purchasers' claim against the United States for negligent inspection and appraisal was barred by the negligent misrepresentation exception. Id. at 378. In Bonuchi, the plaintiffs purchased property later found to be encroaching on a right-of-way. Id. at 378. Before the sale, the FmHA inspected the property, appraised its value, and approved the property as good security for the loan. Id. The FmHA did not survey the property. Id. We concluded that the claim "was based on the communication of misinformation, ... and not on an undertaking by FmHA officials which was performed in a negligent manner." Id. at 379. In contrast, the government here had a duty to inspect the warehouse and Appley Brothers claims are based on the negligent inspection of the warehouse. Bonuchi, therefore, does not control.[5]
 
 
 39
 We reverse the judgment of the district court, and remand for further proceedings consistent with this opinion.
 
 
 40
 ROSS, Senior Circuit Judge, dissenting.
 
 
 41
 I respectfully dissent. Assuming that the employees of the Department of Agriculture breached an affirmative duty to issue a new form TW-125 and a form TW-315 after the August 5, 1988, inspection, and further assuming that these employees also failed to follow up properly to see if the deficiencies were remedied, the fact remains that the ultimate decision to suspend Bird Grain's license or delay the suspension until after another inspection was a discretionary function of the Secretary. As such, the government is entitled to the protection of the discretionary function exception.
 
 
 42
 The court today seems to be extending the law of the Circuit to permit suit where, by virtue of the negligence of government employees in providing information, a supervisor is deemed unable to exercise his clearly established discretionary function. I am not ready to go this far.
 
 
 
 [1]
 7 C.F.R. § 736.9 (1993) also provides the Secretary with discretion in deciding to revoke or suspend a license
 
 
 [2]
 The government also argues that there is no causative nexus between the issuance of the new form TW-125 and the determination of whether to suspend or revoke Bird Grain's license. The question of whether appellants failed to state a cause of action was not before the district court, and is not an issue in this appeal
 
 
 [3]
 The government argues that the Fourth Circuit rejected an argument similar to appellants in United States v. Patterson, 856 F.2d 670 (4th Cir.1988), vacated, 881 F.2d 127 (4th Cir.1989) (en banc). In that case, plaintiffs alleged that the Office of Surface Mining negligently inspected a fire at a coal refuse pile. 856 F.2d at 671. The government argued that the discretionary function applied to the investigator's conduct because the ultimate decision whether to declare an "emergency" or spend money to abate the emergency was discretionary under 30 U.S.C. § 1240. A panel of the Fourth Circuit rejected that argument, reasoning "the agency's discretion in spending money or declaring emergencies does not provide blanket protection for all lower-level ministerial acts leading to the agency's decision." Id. at 674. The Fourth Circuit en banc vacated the panel opinion, however, holding that the Office of Surface Mining acted in a discretionary manner in determining that no emergency situation existed which warranted expenditure of funds. 881 F.2d at 127-28. Patterson is of little help to the government. The agency procedures outlined in Patterson show that the investigator had much broader discretion than did the inspectors here. See 856 F.2d at 674
 
 
 [4]
 28 U.S.C. § 2680(h) excepts from liability "any claim arising out of ... misrepresentation [or] deceit."
 
 
 [5]
 The government also says this case is factually and legally indistinguishable from Preston v. United States, 596 F.2d 232 (7th Cir.), cert. denied, 444 U.S. 915, 100 S.Ct. 228, 62 L.Ed.2d 169 (1979). In Preston, the Seventh Circuit held that the misrepresentation exception barred plaintiffs' claims that the U.S.D.A. negligently inspected a federally-licensed warehouse. Id. at 237-38. The Seventh Circuit, however, decided Preston before the Supreme Court clarified the misrepresentation exception in Block v. Neal, and in any event, the facts of Preston are somewhat different in that Preston involved a state-licensed warehouse. See Block, 460 U.S. at 296-97, 103 S.Ct. at 1093-94 (discussing the negligent misrepresentation exception)